

# NUMBER 13-18-00295-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE MATTER OF M.A.T., A JUVENILE

On appeal from the 130th District Court
of Matagorda County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Longoria and Hinojosa
Memorandum Opinion by Chief Justice Valdez**

By one issue, appellant M.A.T. (M.T.) challenges the juvenile trial court's

certification transferring his case to the adult criminal justice system.[1] Specifically, M.T.

---

[1] Pursuant to Rule 9.8(b) of the Texas Rules of Appellate Procedure, we will utilize aliases when referring to parties and persons related to this proceeding. *See* TEX. R. APP. P. 9.8(b); TEX. FAM. CODE ANN. § 56.01(j) (West, Westlaw through 2017 1st C.S.).

asserts that the evidence was insufficient to support the determination to certify him as an adult. We affirm.

## I. BACKGROUND

### A. Procedural History

M.T. was charged with the capital murder of Devin Davalos, aggravated robbery, and tampering with evidence. *See* TEX. PENAL CODE ANN. §§ 19.03, 29.03, 37.09 (West, Westlaw through 2017 1st C.S.). On November 2, 2017, the State filed its Petition for Discretionary Transfer to Criminal Court asking the trial court to waive its jurisdiction and transfer M.T.'s case to the adult criminal courts. *See* TEX. FAM. CODE ANN. § 54.02 (West, Westlaw through 2017 1st C.S.). The trial court ordered a complete diagnostic study, social evaluation, and full investigation of M.T., his circumstances, and the circumstances of the alleged offense. On April 17 and 18, 2018, the trial court conducted a certification hearing regarding the State's motion to transfer M.T. to an adult criminal court.

### B. Discretionary Transfer Hearing

During the transfer hearing, the State called Texas Ranger David Chauvin as a witness. Ranger Chauvin testified that the Bay City Police Department in Matagorda County contacted him to assist in the investigation of the alleged offense. During Chauvin's investigation, he learned that Davalos was reported missing by his mother and was last seen by her on October 11, 2017. A witness at a convenience store saw Davalos around midnight on October 12, 2017 in the company of M.G.—a juvenile and codefendant of M.T. Based on the statements Ranger Chauvin received from M.G. and Michael Trevino—another codefendant of M.T.,— it appears M.G. contacted Trevino and M.T. to coordinate a robbery, assault, or some type of attack against Davalos. On the

2

night of the murder, while Davalos and M.G. were parked in Davalos's vehicle, Trevino and M.T. came out from a wooded area, and, using a shotgun and rifle, forced Davalos out of his vehicle. Davalos offered them $10,000 to let him go. Instead, they threatened Davalos and forced him into the trunk of his own vehicle. Trevino, M.G., and M.T. got in the vehicle, and Trevino drove away with Davalos in the trunk.

Shortly thereafter, Davalos opened the trunk attempting to escape causing Trevino to stop the vehicle. One or two of the individuals got out of the vehicle and shot Davalos in the chest at least twice.[2] They drove to a rural area used by Trevino's family for hunting in Brazoria County and shot Davalos several more times. Afterwards, they drove to a river where Trevino, M.G., and M.T. removed Davalos's body from the trunk, drug him to the edge of the river, and discarded his body into the river. They drove Davalos's car back to Matagorda County into a deserted ditch and set it on fire. The three boys walked to M.G.'s residence, where they awoke Jesse Cervantes. Ranger Chauvin testified that according to his interview with Cervantes, M.T. told Cervantes they had shot and killed Davalos and stolen his debit card. Cervantes then drove Trevino, M.G., and M.T. to an ATM, but they were unable to retrieve any funds from Davalos's account. They subsequently went their separate ways.

The next day Trevino and M.G. were taken into custody. When M.G. was taken into custody, he had Davalos's cell phone on his person. After taking Trevino's statement, M.T. was taken into custody; however, M.T. requested an attorney and refused to make a statement.

---

[2] According to Ranger Chauvin, M.G. and Trevino gave conflicting statements as to who exited the vehicle and shot Davalos. At the discretionary hearing, these statements were introduced as the State's Exhibit #5.

At the discretionary hearing, Chief Medical Examiner, Dr. Erin Barnhart, testified that the autopsy indicated Davalos had been shot at least nine times: twice in the upper left chest and seven times in the head and face.  According to Dr. Barnhart, none of the shots that were fired occurred postmortem; Davalos was alive for all the gunshot wounds.  The cause of death was multiple gunshot wounds.  In addition, Dr. Michael Fuller, psychiatrist, testified that M.T. was of average intelligence, sophistication, and maturity for a seventeen-year-old.  According to Dr. Fuller, M.T. could aid in his own defense and criminal proceeding.[3]

Juvenile Probation Officer Leslie Penny conducted a social investigation of M.T.  She interviewed family members, individuals at M.T.'s school, and individuals that interacted with M.T.  She produced an investigative report concluding that M.T. was mature and sophisticated.

The trial court waived its jurisdiction and explained the factors that contributed to its decision.  The trial court signed M.T.'s certification on May 23, 2017.  This interlocutory appeal followed.  *See* TEX. FAM. CODE ANN. § 56.01(c)(1)(A) (West, Westlaw through 2017 1st C.S.).

## II.    STANDARD OF REVIEW AND APPLICABLE LAW FOR DISCRETIONARY TRANSFER

In order to waive jurisdiction and transfer M.T. to be tried as an adult pursuant to subsection (a) of the family code, the juvenile court had to find that (1) M.T. was alleged to have committed a felony; (2) he was fourteen years old or older at the time he committed the alleged offense (a capital felony for which no adjudication hearing has

---

[3] Dr. Michael Ditsky, a Texas licensed psychologist, also testified at the discretionary hearing; however, the trial court did not find his conclusions to be credible or supported by facts.  Because M.T. does not challenge this finding, we will not address Dr. Ditsky's testimony.

4

been conducted); (3) after a full investigation and a hearing, there was probable cause to believe that M.T. committed the alleged offense; and (4) the welfare of the community required criminal proceedings because of the alleged offense's seriousness or M.T.'s background. *See* TEX. FAM. CODE ANN. § 54.02(a)(1)–(3); *Moon v. State*, 451 S.W.3d 25, 38 (Tex. Crim. App. 2014).

In making this determination, the juvenile court had to consider, among other matters: (1) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against persons; (2) the sophistication and maturity of M.T.; (3) the record and previous history of M.T.; and (4) the prospect of adequate protection of the public and the likelihood of the rehabilitation of M.T. by use of the procedures, services, and facilities currently available to the juvenile court. *See* TEX. FAM. CODE ANN. § 54.02(f). These factors are nonexclusive and serve to facilitate the juvenile court's balancing of the potential danger to the public posed by that particular juvenile offense with his amenability to treatment. *Moon*, 451 S.W.3d at 38 (citing *Hidalgo v. State*, 983 S.w.2d 746, 754 (Tex. Crim. App. 1999)). Although the juvenile court makes its final determination from the evidence concerning the section 54.02(f) factors, the court "need not find that each and every one of those factors favors transfer before it may exercise its discretion to waive jurisdiction." *Id*. at 41.

Section 54.02(h) requires that if the

> [J]uvenile court waives jurisdiction, it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings and cause the results of the diagnostic study of the person ordered under Subsection (d), including psychological information, to be transferred to the appropriate criminal prosecutor. On transfer of the person for criminal proceedings, the person shall be dealt with as an adult and in accordance with the Code of Criminal Procedure.

5

TEX. FAM. CODE ANN. § 54.02(h).

Regarding our review of the trial court's order, the Texas Court of Criminal Appeals

has instructed the following:

> [I]n evaluating a juvenile court's decision to waive its jurisdiction, an appellate court should first review the juvenile court's specific findings of fact regarding the Section 54.02(f) factors under "traditional sufficiency of the evidence review."[4]   But it should then review the juvenile court's ultimate waiver decision under an abuse of discretion standard.  That is to say, in deciding whether the juvenile court erred to conclude that the seriousness of the offense alleged and/or the background of the juvenile called for criminal proceedings for the welfare of the community, the appellate court should simply ask, in light of its own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles.  In other words, was its transfer decision essentially arbitrary, given the evidence upon which it was based, or did it represent a reasonably principled application of the legislative criteria?  And, of course, reviewing courts should bear in mind that not every Section 54.02(f) factor must weigh in favor of transfer to justify the juvenile court's discretionary decision to waive its jurisdiction.

*Moon*, 451 S.W.3d at 47.  Additionally,

> [A] reviewing court should measure sufficiency of the evidence to support the juvenile court's stated reasons for transfer by considering the sufficiency

---

[4] Juvenile cases are reviewed under the civil standards of review for legal and factual sufficiency. *Matter of G.B.*, 524 S.W.3d 906, 914 n.13 (Tex. App.—Fort Worth 2017, no pet.).  Because the State's burden is the preponderance of the evidence, *see Moon v. State*, 451 S.W.3d 28, 35, 40, 46 (Tex. Crim. App. 2014), we may sustain a legal sufficiency challenge only when:  (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014).  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005).  Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

When reviewing a challenge that evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

of the evidence to support the facts as they are expressly found by the juvenile court in its certified order. The appellate court should *not* be made to rummage through the record for facts that the juvenile court *might* have found, given the evidence developed at the transfer hearing, but did not include in its written order. We therefore hold that, in conducting a review of the sufficiency of the evidence to establish the facts relevant to the Section 54.02(f) factors and any other relevant historical facts, which are meant to inform the juvenile court's discretion whether the seriousness of the offense alleged or the background of the juvenile warrants transfer for the welfare of the community, the appellate court must limit its sufficiency review to the facts that the juvenile court expressly relied upon, as required to be explicitly set out in the juvenile transfer order under Section 54.02(f).

*Id.* at 49–50 (emphasis in original).

## III. SUFFICIENCY OF THE EVIDENCE

By his sole issue, M.T. argues that the evidence was insufficient to support the trial court's determination to certify. We disagree.

### A. Applicable Law and Discussion

"Any person accused of committing a felony offense between his tenth and seventeenth birthdays is subject to the exclusive original jurisdiction of a juvenile court." *Id*. at 37; *Ex parte Arango*, 518 S.W.3d 916, 920 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). A juvenile court has the power to hear and decide matters pertaining to the juvenile offender's case before any other court can review them. *Moon,* 451 S.W.3d at 37–38. The right of a juvenile offender to remain outside the jurisdiction of the criminal district court, however, is not absolute. *Id*.

The first step of our evaluation of the trial court's decision to certify M.T. as an adult is to review its findings of facts under a traditional sufficiency review. The trial court stated the following facts in reaching its decision:

1. Juvenile/ Respondent is charged with capital murder.

7

2. His date of birth is June 22, 2001. At the time of the alleged offense, M.T.'s age was 16 years, 3 months and 19 days.

. . .

5. The Court received the following reports in evidence without objection:

> Exhibit 1: Social Evaluation and Investigation prepared by Leslie Penny, Juvenile Probation Officer;
>
> Exhibit 2: Report of Psychiatric Examination, Waiver to Adult Court, prepared by Michael A. Fuller, M.D.; and
>
> Exhibit 3: Psychological Forensic Evaluation prepared by Michael G. Ditsky, Ph.D.

6. Each author testified in the proceedings. Other witnesses testified as well as to matters relevant to the proceedings.

7. In making a determination whether to certify a child as an adult, the court "shall consider among other matters:

> (a) Whether the alleged offense was against a person or property, with greater weight in favor of transfer given to offenses against the person;
>
> (b) the sophistication and maturity of the child;
>
> (c) the record and previous history of the child;
>
> (d) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services and facilities currently available to the juvenile court."

TEX. FAM. CODE ANN. § 54.02(f).

. . .

15. The adult charged, Michael Trevino, and the other charged juvenile gave statements. M.T. did not provide a statement.

. . .

21. A court may not certify a juvenile as an adult for trial due to the mere category of the alleged offense. *Moon*, 451 S.W.3d at 48.

The trial court then evaluated the different factors in section 54.02(f) of the family code in support of its decision to certify M.T. as an adult. *See* TEX. FAM. CODE ANN. § 54.02(f).

**1.      Alleged Offense**

The trial court first considered the offense itself based mainly on the testimony of

Dr. Barnhart and Ranger Chauvin.  The trial court issued the following findings:

**II.      The alleged offense is capital murder — a crime against the person**

10.      M.T. is charged with capital murder.  There are two co-defendants; one was 17 at the time and has been charged as an adult.  The other was 16 and like M.T., has been charged as a juvenile.

11.      The police reports (admitted as Exhibit 6) detail the allegations against M.T.  According to the report, the three charged persons kidnapped the victim, shot him, but did not cause his immediate death, transported him to another location, shot him further, then transported him to the Brazos River where they delivered the fatal gun shots then dumped him into the river.

. . .

14.      Dr. Barnhart chronicled gunshot wounds to the right cheek, chin (five total), left cheek, left upper chest (two), and left upper back (two).  According to Dr. Barnhart, none occurred post-mortum [sic].

15.      The adult charged, Michael Trevino, and the other charged juvenile gave statements.  M.T. did not provide a statement.

16.      According to Trevino, the first shots were fired in Bay City while the victim was in the trunk of his vehicle.  The next set of shots occurred off of Highway 35 near the Matagorda & Brazoria County line.

17.      After that, according to Trevino's statement, the three shot him again in Brazoria County and dumped the victim's body into river.

18.      The full details of the alleged offense and investigation are included in Exhibit 6 and are not repeated in full here.

19.      Probable cause exists to charge M.T. with the capital murder offense.

20.      The crime was particularly gruesome and took place over an extended period of time.

21.      A court may not certify a juvenile as an adult for trial due to the mere category of the alleged offense.  *Moon*, 451 S.W.3d at 48.

. . .

9

23. After reviewing the all [sic] evidence, and in particular, the autopsy and Exhibit 6, the court finds the offense alleged here is so depraved and of such an egregious character such that it may alone justify transfer.

The record provides evidentiary support for the trial court's findings. The State presented evidence about the investigation of capital murder. Statements made by Trevino and M.G. showed that M.T., M.G., and Trevino forced Davalos into the trunk of his own vehicle using a rifle and shotgun. The evidence showed that Trevino, M.G., and M.T. drove Davalos to Brazoria County and shot him five more times then dumped his body in the river. According to Cervantes, M.T. told Cervantes, "man, he's just trying to make sure we did it right. . . we killed him," and that the three of them, "opened the trunk and unloaded one clip in [Davalos'] face while he was in the trunk." According to Ranger Chauvin, nine shell casings were recovered. The trial court also considered Dr. Fuller's autopsy report.

Based on the record, we conclude there is both legally and factually sufficient evidence to support the trial court's findings that probable cause existed that M.T. committed the alleged offense and that his alleged actions were egregious and aggravating. *See Matter of G.B.*, 524 S.W.3d 906, 919 (Tex. App.—Fort Worth 2017, no pet.) (concluding that there was both legally and factually sufficient evidence to support the trial court's finding that defendant was a principal or party to the offense and that his alleged actions and conduct were indeed heinous).

2. **Sophistication and Maturity**

The trial court next considered the sophistication and maturity of M.T. and made the following findings:

10

### III. M.T. has below average raw intelligence and an average level of sophistication and maturity.

24. Dr. Fuller, psychiatrist, described M.T. as "cooperative and respectful," and that ["]he cooperated with all aspects of the interview."

25. Fuller further stated that M.T. "participated with minimal effort" and that he had interacted with "poor effort."

26. Fuller concluded in his report and testimony that M.T. was a "well-developed 17-year old male with average innate intelligence." According to Dr. Fuller, M.T. is a "reasonably intelligent and reasonably mature adolescent who could be certified for trial as an adult. . . ."

27. The court finds Fuller's report and testimony to be well-reasoned and supported.

. . .

36. The court finds that M.T. has below average intelligence and an average level of sophistication and maturity. This factor is found to weigh neither in the State's nor M.T.'s favor.

Although the trial court found this factor to be neutral, it also found Dr. Fuller's report and testimony to be well-reasoned and supported. According to Dr. Fuller, M.T. is a "reasonably intelligent and reasonably mature adolescent who could be certified for trial as an adult" and was fit to proceed. Thus, the record supports the trial court's finding. In addition, Officer Penny testified that based on her social evaluation, investigation, and review of the offense reports, it was her opinion that M.T. was mature and sophisticated. Moreover, in light of M.T.'s behavior immediately after the murder—dumping Davalos's body into the river, setting the car on fire, and attempting to withdraw funds from Davalos's debit card at a nearby ATM—we conclude that there is sufficient evidence to support the likelihood that M.T. deliberately chose to continue his criminal activities after the murder, steal from Davalos, and avoid punishment, and that these decisions are more

11

sophisticated and mature than decisions made by most sixteen-year-old children. *See Matter of G.B.,* 524 S.W.3d at 920.

### 3. Record and Previous History

The trial court then considered M.T.'s prior criminal history and prior interactions with law enforcement and found that this factor weighed slightly in M.T.'s favor. Officer Penny testified that although M.T. had previously been referred to the probation department, he had not been found to be a child who engaged in delinquent conduct. The trial court weighed this factor in favor of M.T. and against certification.

### 4. Protection of the Public and Likelihood of Rehabilitation

Next, the trial court considered what types of rehabilitation would be available if M.T. stayed within the juvenile system, and if those options were likely to offer protection to the public. The court found that neither the State nor the defense presented evidence fully describing the available or preferred juvenile programs as applied to M.T.'s particular situation. The court found Officer Penny's report to be conclusory and wholly inadequate.

However, at the discretionary hearing, Ranger Chauvin testified that while M.T. was in custody, he related the events of the night in question to another juvenile. While M.T. reminisced about the murder of Davalos and the events that transpired, M.T. would start laughing. Similarly, Dr. Fuller testified that M.T. "chuckled at times when talking about either the offense or consequences." In his report, Dr. Fuller noted that M.T. appeared "jovial" when discussing the charges. Furthermore, Officer Penny explained that there is a capital offender program available to juveniles in the juvenile justice system, but she opined that those services do not equate to the seriousness and heinousness of this crime. Thus, she believed it was appropriate to certify M.T. as an adult. She added

that while M.T. has been incarcerated in a Matagorda County juvenile detention facility pending trial, he had been involved in a total of one hundred incident reports: ninety-six minor incident reports and four major incident reports. Nonetheless, the court applied the general presumption against certification.

### 5. Sufficiently Egregious Character

Last, the trial court considered whether M.T. should be certified as an adult due to the severity of the alleged offense. Specifically, M.T. challenges the sufficiency of the evidence to support the egregious character of the offense.

### a. Applicable Law

Appellate courts have long held that the offense that the juvenile is alleged to have committed alone will justify the juvenile court's waiver of jurisdiction notwithstanding other section 54.02 (f) factors, so long as the offense: (1) is substantiated by evidence at the transfer hearing, and (2) is of sufficiently egregious character. *Moon*, 451 S.W.3d at 48. "A court does not abuse its discretion by finding the community's welfare requires transfer due to the seriousness of the crime alone, regardless of the child's background." *McKaine v. State*, 170 S.W.3d 285, 291 (Tex. App.—Corpus Christi 2005, no pet.); *Faisst v. State*, 105 S.W.3d 8, 11 (Tex. App.—Tyler 2003, no pet.) ("[C]ourt does not abuse its discretion by finding the community's welfare requires transfer due to the seriousness of the crime [intoxication manslaughter] alone, despite the child's background."); *Matter of D.D.,* 938 S.W.2d 172, 177 (Tex. App.—Fort Worth 1996, no writ) ("The seriousness of the offenses a defendant is charged with [capital murder, murder, aggravated kidnapping, among others] is sufficient to support his transfer despite his background."); *C.M. v. State*, 884 S.W.2d 562, 564 (Tex. App.—San Antonio 1994, no writ) ("The [juvenile court] is free to

13

decide to transfer the case due to the seriousness of the crime, even if the background of the child suggests the opposite."); *In re J.S.C.,* 875 S.W.2d 325, 326 (Tex. App.—Corpus Christi 1994, writ dism'd by agr.); *Matter of C.C.G.*, 805 S.W.2d 10, 14 (Tex. App.—Tyler 1991, writ denied) (emphasis on original) ("[A]ssuming, arguendo that there is insufficient evidence concerning a defendant's background, the juvenile court's determination that the seriousness of the offense, as substantiated by the evidence, is alone sufficient).

**b. Discussion**

Much of the evidence supporting the severity of the crime is described above; nonetheless, we focus on some of the details here. The court made the following findings:

**VI. M.T. should be certified as an adult due to the "sufficiently egregious character" of the alleged offense.**

20. The crime was particularly gruesome and took place over an extended period of time.

21. A court may not certify a juvenile as an adult for trial due to the mere category of the alleged offense. *Moon*, 451 S.W.3d at 48.

22. The court may, however, certify a juvenile as an adult for trial on the basis of the offense alleged to have been committed by him if the evidence suggests the offense was of a "sufficiently egregious character," to justify the transfer. *Id*.

. . .

23. After reviewing the all [sic] evidence, and in particular, the autopsy and Exhibit 6, the court finds the offense alleged here is so depraved and of such an egregious character such that it may alone justify transfer.

. . .

41. The capital murder charge against M.T. involves the kidnapping and murder of a 17-year old male.

42. According to the statements and investigation, the alleged crime did not occur in the heat of the moment—the charged persons

14

assembled and planned the crime and also a potential cover-up by dumping the body into the river and then burning the car. The investigation alleges a crime that is particularly gruesome and savage, involving the kidnapping and torture of a young man.

43. The court further finds that the other factors, to the extent they weigh in favor of the juvenile court retaining jurisdiction, do not weigh so heavily in that direction as to overcome the conclusion that the crime alleged is of such a sufficiently egregious character as to support waiver and certification.

During the hearing, the State presented evidence that the conspirators forced Davalos into the trunk of his car at gunpoint. The evidence at trial showed that the boys assembled and planned the crime and a potential cover up by dumping the body into the river then burning the car. Although M.T. argues "there is not even a scintilla of evidence to support the court's finding that the crime involved the torture of a young man," Dr. Barnhart testified that the first two wounds to Davalos's chest did not result in a loss of consciousness. Therefore, Davalos was conscious and injured while trapped in the trunk of his vehicle when Trevino, M.G., and M.T. drove him to another county. Davalos was then shot another seven times before the conspirators disposed of his body. Thus, there is ample evidence supporting the considerable lag time involved in rendering the fatal shot. In addition, the trial court could have reasonably inferred from the evidence that because Davalos did not die instantly, Davalos was conscious and suffering pain from several gunshot wounds to his chest and face—the very definition of murder by torture. *Murder,* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "murder by torture" as "[a] murder preceded by the intentional infliction of pain and suffering on the victim"). Moreover, the trial court could have also inferred that Davalos feared for his life as he offered the conspirators money to let him go when they threatened him with a deadly weapon. Although capital murder is certainly a serious offense, the facts here—which

15

may be gleaned from the offense report, the autopsy report, and the social evaluation and investigation report that were all admitted as exhibits at the hearing—are undoubtedly of a "sufficiently egregious character." *See Matter of G.B.*, 524 S.W.3d at 918 (finding that the nature of defendant's actions and conduct, the manner in which they were allegedly committed by defendant, and defendant's alleged conduct of covering up the offense were of a "heinous nature"); *Matthews v. State*, 513 S.W.3d 45, 60 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Accordingly, we hold the evidence was legally and factually sufficient to support the trial court's finding that the crime was of a particularly egregious character.

Considering the trial court's explicit findings and our own review of the record, which supports those findings, we conclude that the juvenile court did not abuse its discretion by waiving jurisdiction and transferring M.T. for trial as an adult. See *Matter of G.B.*, 524 S.W.3d at 918. The State adequately established, "by a preponderance of the evidence, that the welfare of the community requires transfer of jurisdiction for criminal proceedings because of the seriousness of the offense . . . ." *See Moon*, 451 S.W.3d at 40–41; *Matthews,* 513 S.W.3d at 60–61. The juvenile court's decision was appropriately guided by the statutory criteria, principled, and reasonable. *See Gonzales v. State*, 467 S.W.3d 595, 602 (Tex. App.—San Antonio 2015, pet. ref'd). Accordingly, we overrule M.T.'s sole issue.

## IV. CONCLUSION

Having overruled M.T.'s sole issue, we affirm the juvenile court's order transferring jurisdiction.

/s/ Rogelio Valdez
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
25th day of October, 2018.